## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| YOLANDA DOSIER, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | FILE NO. _____ |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| CITY OF ATLANTA, GEORGIA, | ) | |
| and JEFFREY NORMAN, | ) | |
| in his official capacity as | ) | |
| Commissioner of Human Resources, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

1.

Yolanda Dosier ("Ms. Dosier" or "Plaintiff") files this Complaint against Defendants City of Atlanta, Georgia ("City"), and Jeffrey Norman, in his official capacity as Commissioner of Human Resources, ("Norman"; and collectively with the City, "Defendants"), for violations of the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and the Georgia Whistleblower Act, O.C.G.A. § 45-1-4.

## <u>INTRODUCTION</u>

### 2.

Marian Woods received a huge salary of more than $ 200,000 a year in her role as the Commissioner of Human Resources for the City - more money than most people ever make despite how hard they work. Woods' job was to create and then enforce rules within the City's Human Resources Department. It is not yet known why Woods continued in this role making so much money after complaints continued to be lodged against her for workplace misconduct. What *is* known is that Woods did not care too much for rules when they applied to *her*. Eventually, the City had no choice but to act like it was "investigating" the complaints against Woods. When Ms. Dosier realized that the City was only going through the motions and did not intend to actually investigate Woods, she bravely went outside her chain of command and disclosed Woods' illegal conduct to the City Council. Dosier did not receive any accolades for her disclosure(s) to the City Council. Instead, the City drummed up some reasons and then  terminated her employment. As a public employee Ms. Dosier brings this Complaint for violations of  her clearly established free speech rights under the First and Fourteenth Amendments and her rights as a public employee under the Georgia Whistleblower Act.

**JURISDICTION AND VENUE**

3.

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has further jurisdiction over Ms. Dosier's state law claims pursuant to 28 U.S.C. § 1367.

4.

This Court has authority to issue the requested declaratory relief under 28 U.S.C. § 2201.

5.

This Court has authority to issue the requested injunctive relief under Fed. R. Civ. P. 65 and 28 U.S.C. § 1343(a)(3).

6.

This Court is authorized to award the requested damages under 28 U.S.C. § 1343(a)(3).

7.

This Court is authorized to award attorneys' fees under 42 U.S.C. § 1988.

8.

This Court is an appropriate venue for all of Ms. Dosier's claims pursuant to 28 U.S.C. § 1391(b) because, upon information and belief, all Defendants reside within the District and division, and all of the events giving rise to Ms. Dosier's claims occurred within the Northern District of Georgia.

## THE PARTIES

9.

Yolanda Dosier is a citizen of the State of Georgia and a resident of Cobb County, Georgia. She submits herself to the jurisdiction of this Court.

10.

The City of Atlanta is a municipal corporation chartered under the State laws of Georgia, and is subject to the venue and jurisdiction of this Court. The City may be served with process and a copy of this Complaint upon Mayor Keisha Lance Bottoms at her business address at 55 Trinity Avenue, Atlanta, Georgia 30303.

11.

The City of Atlanta is a "public employer" within the meaning of O.C.G.A. § 45-1-4.

12.

Jeffrey Norman is, and was at the time of Ms. Dosier's termination, the interim Commissioner of Human Resources for the City. Norman is sued in his official capacity as Commissioner of Human Resources under 42 U.S.C. § 1983 and he may be served with process and  a copy of this Complaint at his business address at 68 Mitchell St., Suite 2150, Atlanta, GA 30303.

13.

The City of Atlanta Charter, Article III, Chapter 3, Section 3-305, governs the appointment of the Commissioner of Human Resources; the Commissioner serves as the administrative head of the Human Resources Department ("HR") and has the authority to appoint and remove employees who work in HR.

14.

As the interim commissioner, Norman is responsible for the administration of HR; under Section 3-305(c) of the City's Charter, he has the power to appoint and remove all or any HR employees.

## THE FACTS

### 15.

In 2014, the City hired Ms. Dosier to work as a recruiter. The City was extremely happy with Ms. Dosier's work which garnered positive reviews and regular increases to her salary.

### 16.

In 2016, Ms. Dosier was promoted to a managerial position in recognition of her excellent work performance and increasing contributions to HR. Beginning in 2018, Ms. Dosier reported to Kimberly Finley, the Talent Acquisition Director.

### 17.

In her position as Talent Acquisition Manager, Ms. Dosier supported a number of departments, including the Department of Watershed, Department of Public Works, Atlanta Streetcar, and Renew Atlanta. Ms. Dosier was generally responsible in each department for all recruiting related activities, staffing and recruiting strategies, workforce planning, overseeing all aspects of the hiring and on-boarding process, and ensuring that all City policies and procedures were complied with during the hiring process. As a manager, Ms. Dosier supervised a team of six employees; 3 Recruiting Coordinators and 3 Recruiters.

18.

In 2017, the City initiated a massive project to convert its old HR software system to a modern cloud-based system called ATL-Cloud. Ms. Dosier was assigned to work on the project to automate the hiring process. The new system cost millions of dollars and was completed and implemented in October 2018; the City's hiring and promotional processes were then entirely managed online.

19.

In June 2018, Marian Woods started as the new Commissioner of HR for the City.

20.

Ms. Dosier met with Woods shortly after she was hired to review the upcoming online approval process for new hires and promotions. Woods was initially supportive of the new system and agreed that it would be a positive step to modernize the City's HR procedures and eliminate paperwork.

21.

Also in 2018, the City Council passed Resolution 18-R-3779 addressing workplace bullying across all of the City's operations. The resolution directed the Commissioner of HR to meet with various unions representing City employees to

review the issue and prepare legislation on workplace bullying in the City's ordinances.

22.

In October 2018, the City adopted an Anti-Bullying & Workplace Violence Policy (the "Policy") establishing rules for investigating and imposing disciplinary actions against employees responsible for violence, threats, psychological abuse, workplace bullying, and harassment. Pursuant to the Policy, the sole option for reporting such conduct was to bring the grievance to the Office of Labor and Employee Relations within the HR Department.

23.

Although Woods had no choice but to sign off on the Policy, she had no intention of actually following it herself given that she routinely engaged in the very behavior the Policy was intended to prohibit.

24.

For example, Woods used foul language and routinely referred to employees as "bitches." Ms. Dosier finally learned that Woods made racial distinctions within her workforce, regularly using words like "nigger" and "white bitch."

25.

In one instance, Woods referred to a long-time HR employee as a "white bitch" - engaging in both blatant racism and bullying towards one of her subordinates. Woods also employed varied methods of intimidation and called employees names such as "stupid."

26.

Ms. Dosier was usually out of the office due to her recruiting activities and assignment on the ATL-Cloud project, so she, thankfully, had limited interactions with Woods.

27.

In January 2019, when Ms. Dosier's responsibilities with ATL-Cloud were lessened and she was physically in the office, she unfortunately encountered Woods.

28.

For example, Ms. Dosier's supervisor, Kim Finley ("Finley"), insisted that she (Ms. Dosier) listen to a call with Woods so she would have first hand knowledge of Woods' conduct. In that call, Woods referred to an employee in the

Mayor's Office and stated (generally) "that bitch does not know who she is dealing with and she better stand down."

29.

Finley explained that Woods' statements, such as "nigger" and "white bitch," and varied threats against subordinate employee's jobs were a regular occurrence.

30.

Despite the City's investment in its online recruiting system, Woods ultimately refused to use it and demanded that the Talent Acquisition team continue to circulate paperwork with signatures for offers. Woods' refusal to use the tools implemented by the City caused numerous issues in the department such as redundancy and confusion.

31.

Woods delegated her approval authority to different subordinates, including Finley and a Deputy Commissioner, and insisted on reviewing paper approval files compiled separately for her by recruiters. Woods' unilateral demand for physically signed paperwork and files created specially for her personal review undermined

the sole purpose of the online approval process that the City had spent millions of

dollars and 18 months to implement.

32.

Woods' refusal to use the City's system caused numerous issues within HR

such as delaying new hires and pay raises. The most serious effect of Woods'

failure to comply was the City's delay in paying its employees pursuant to its

regular pay practices (for work they performed on behalf of the City). HR

employees were also forced to follow their chain of command on unsigned and

unapproved offers that sat with Woods for extended periods of time causing

unnecessary delay.

33.

When confronted about the varied issues which resulted from her refusal to

use the City's tools, Woods was hostile and defensive and just ignored the process

altogether.

34.

Repeated efforts were made to try to get Woods to comply with the City's

policies including using the online system that the City had spent millions of

dollars to develop. But, Woods ignored each of these efforts, and she continued to

insist that physical signatures were required before submission to her office for approval.

35.

Ms. Dosier and her team had no choice but to adhere to Woods' requirements and chase paperwork to confirm that approvals and offers with physical signatures were complete prior to finalizing a new hire and sending an offer letter. Under this duplicate system, which wasted time and caused unnecessary delay, new hires now received both an electronic offer letter from the HR system and a hand-signed offer letter via email.

36.

In April 2019, Finley directed Ms. Dosier, as an administrator for the Talent Acquisition portion of ATL-Cloud, to remove Woods' name from the electronic offer letters in the system. Finley explained to Dosier that Woods demanded that her name be removed from the on-line letters because she inexplicably did not want employees to receive anything other than the hand-signed offer letter, and she did not "trust" the online system.

37.

Ms. Dosier was floored by this turn of events; millions of dollars of tax-payer money was spent to build the online system which City employees could use to prepare and track new hires, but Woods refused to use it. At the direction of Finley, Ms. Dosier followed her instructions and removed Woods' name. The online letter would now come from the City of Atlanta "Talent Acquisition Team" which distinguished it from the printed offer letter signed by Woods.

38.

Ms. Dosier was further advised by Finley that Woods also wanted the name of the letter changed to remove the phrase "offer letter" from the electronic notice going to new employees. Ms. Dosier explained to her supervisor that she did not have the authority to change the "offer letter" designation in the system, because it was designed to automate the offer letter process.

39.

Ms. Dosier became nervous and refused to take steps outside her level of authority. She advised Finley that a change of the magnitude purportedly requested by Woods would require the City to send a change order to the outside developers for the system. This change could also expose the City to incur unnecessary costs

to change a process that did not require change. Finley agreed with Ms. Dosier and advised her that she (Finley) and the head of HR Information Systems, Elaine Gooden, would meet with Woods to explain the issue.

40.

On May 29, 2020, HR received complaints about an employee who posted a screenshot of his  promotion letter from the City to social media, the same outlet where he had also posted about a sexual encounter during the work day.

41.

Woods then started to pay attention; on May 29, she texted Finley that no further offer letters should be sent out from the ATL-Cloud system. Woods ignored the fact that the employee's promotion had already been signed off on by her and approved in the system by her designee, so that he was sent both an online letter and a hand-signed letter.

42.

Woods, suddenly paranoid and angered, pointed the finger at the online offer system and spuriously demanded that all pending offers be rejected without review. Such action then caused delay and disruption in several City departments with offers pending for numerous positions.

14

43.

Woods knew the departments would not be happy about the interruption to their respective hiring processes so she demanded that the staff in HR outright lie to other City employees and say that the rejections were caused by a system malfunction.

44.

Since the City had already spent millions of dollars for the new system, it had a vested interest in making sure it worked. Reports of "glitches" and "malfunctions" in the system then usually involved reports to the developers which caused increased financial obligations.

45.

Finley notified Ms. Dosier of Woods' text message leading to the mass rejection of pending offers in the system. Ms. Dosier was also shocked that Woods was intimidating her employees and demanding that they lie about the system to cover up Woods' issues with the letter.

46.

Ms. Dosier further questioned Woods' motives based on her reaction to the offensive social media post. Since Woods' refused to comply with the online

system, applicants would now receive two letters from the City so the offending employee could have posted the one signed personally by Woods as easily as the online letter.

47.

One day after Woods demanded that City employees lie, Ms. Dosier's administrator access to the online system was revoked. When Ms. Dosier asked Finley for an explanation, she was told to ask Woods.

48.

Ms. Dosier went to Woods' office that same day to schedule a time to speak. When Ms. Dosier asked Woods' assistant about available times, Woods intervened shouting from her office that she wanted to know what Ms. Dosier wanted. Ms. Dosier explained that she wanted to schedule time to talk about the removal of her administrator access as it seemed punitive and she did not understand the reasons.

49.

At this point, Woods was screaming while walking to the door. Woods stated: It is not a Yolanda infraction. Infractions have been made, but they will be addressed later.

50.

Ms. Dosier, humiliated by Woods' hostility and unprofessionalism, excused herself and started to cry as she walked away. Woods then screamed so loud that Matthew Bartlett, another City employee, who was waiting to meet with Woods in an adjacent conference room became concerned and stepped out to check on Ms. Dosier.

51.

The following week, on June 4, 2019, Ms. Dosier was called into a meeting with Deputy Commissioner Danielle Nichols and Finley to discuss the encounter with Woods on May 30. Nichols did not dispute that Woods was yelling at Ms. Dosier, but told Ms. Dosier that Woods "should not have had to go through that." Nichols instructed Ms. Dosier to bring any issues to her in the future to avoid confrontations with Woods. Other than telling Ms. Dosier not to interact with Woods, Nichols did nothing to address Woods' aggressive and humiliating conduct towards Ms. Dosier and in HR.

52.

The same day, Ms. Dosier and Finley discussed options for how to report Woods' abusive behavior and illegal conduct that were now interfering with the

City's operations across multiple departments. Ms. Dosier was very concerned that City employees were directed to lie by Woods but she feared that any report to Employee Relations under the Policy would go directly to Woods and result in retaliation.

53.

Also on June 4, 2019, Woods and her Deputy Commissioners presented the annual Budget Personnel Paper to the City Council. Although the presentation affected the operations of Ms. Dosier's team, Finley told Ms. Dosier that she was no longer allowed to attend the City Council meeting; Woods did not want HR Department employees in the audience.

54.

Shocked that Woods was keeping HR employees from the meeting - presumably to hide or cover up Woods' bad acts - Ms. Dosier contacted Andrea Boone, a city council member, and notified Boone of Woods' interference with HR's access to the public meeting.  Ms. Dosier had previously spoken to Boone about Woods' aggressive conduct towards HR employees in an effort to bring public attention to Woods' actions.

55.

Three days later, on Friday June 7, 2019, Woods had another loud and disruptive altercation, this time with Shanteria Starr, her assistant. Woods began screaming at Starr so loudly that she was overheard by employees in adjoining offices who became concerned. The incident escalated to the point that City employees who heard Woods feared for Starr's safety, incredibly stepping in and pulling Woods away from Starr.

56.

After Woods' verbal attack on Starr, Ms. Dosier knew that Woods' abusive and illegal conduct in the workplace could not continue unabated. Ms. Dosier feared for her own safety but she knew that the public had a right to know what was happening within the City. Ms. Dosier contacted Joshua Williams, the City's Chief Operations Officer, to notify him that Woods' misconduct involved more than just the incident that day with Starr and she requested an investigation into Woods.

57.

That same day, Ms. Dosier spoke to Thad Flowers, the Chief of Staff to City Council Member Antonio Brown. Ms. Dosier realized that the City Council must

be made aware of Woods' illegal conduct in the City and she disclosed to Flowers that Woods' was engaging in illegal conduct. Dosier described Woods' abusive and illegal conduct and also notified him of Woods' altercation with Starr.

58.

The next day, Ms. Dosier disclosed the most recent violations to Pastor Eric Thomas, a Constituent Services advisor to Mayor Keisha Lance Bottoms. Ms. Dosier had previously notified Thomas about Woods' misconduct, but nothing had been done.

59.

After the Mayor became involved, Woods was placed on administrative leave with full pay, and Jeffrey Norman, an attorney from the Law Department, was assigned as interim Commissioner of HR in her place.

60.

The City initiated an "investigation" into Woods' altercation with Starr. Although Ms. Dosier did not witness the incident, she was interviewed by the Law Department as part of the investigation because she had separately contacted the Mayor's office about Woods' illegal misconduct.

61.

On June 10, 2019, Ms. Dosier participated in her first interview with the Law Department. Although the questions from the Law Department were limited to Woods' altercation with Starr. Ms. Dosier, disclosed to investigators:

- Woods used the term "bitch" regularly, including in reference to a member of the Mayor's staff;

- Woods regularly used demeaning, offensive and racist language to refer to other City employees, like "nigger" and "bitch";

- Woods regularly held up new hire and other employee transactions resulting in payroll errors and employees working without pay; and

- Woods cancelled all pending offers in the online system in May and then lied to blame it on a system "glitch" which could expose the City to additional fees from the developers to correct a fake problem.

62.

Ms. Dosier then attended a meeting with Joshua Williams, Norman, an investigator from the Law Department, and several HR employees to discuss Woods. With the investigation still pending, Williams suggested that the

employees consider a "reset" and just have Woods return from leave to continue as Commissioner of HR while earning $210,000 in salary.

63.

Ms. Dosier was shocked that Woods could possibly return to her position before the investigation could be concluded. Ms. Dosier objected to Woods' return and the City's obvious efforts to circumvent the investigation and its rules and regulations.

64.

Ms. Dosier was aware that the City had recently terminated two other managers who engaged in similar violations of the Anti-Bullying policies. Ms. Dosier did not want other departments to believe the rules did not apply to the HR Department.

65.

It became more than obvious that neither the Mayor's office nor the Law Department intended to enforce the City's own rules, including its anti-discrimination policies. Ms. Dosier did not want the waste resulting from Woods' acts - such as demanding that City employees lie leading to increased costs to fix "glitches" in the on-line system which was not in disrepair - to be ignored.

When it was clear to her that Woods' illegal and abusive conduct would be ignored, Ms. Dosier knew that she had no choice but to bring public attention to Woods' waste and abuse within the City.

66.

On June 11, Ms. Dosier scheduled a meeting with two City Council Members, Andrea Boone and Michael Julian Bond. During the meeting, Ms. Dosier and Finley disclosed Woods' misconduct, including her statements based on race and her demands that City employees lie about the online system. The Councilmembers asked Ms. Dosier and Finley to send an *anonymous* letter to the City Council to notify the public about Woods' waste and abuse to drive public discussion of Woods' misconduct.

67.

Following the meeting with Boone and Bond, Ms. Dosier and Finley prepared and distributed an anonymous letter outlining all of Woods' misconduct, including Woods' regular use of the words "bitch" and "nigger." Dosier and Finley explained Woods' use of derogatory language, failure to timely review and approve employee transactions, threats on employees' jobs for failure to cede to her demands, and possible hiring of a relative as Deputy Commissioner - which

violated the City's Code of Ethics and the City's Anti-Bullying policy adopted pursuant to resolution of the City Council.

68.

At the next City Council meeting on June 17, the anonymous letter was discussed. Members of the public were incensed that Woods abused employees in the workplace. The public objected to Woods' actions which interfered with the livelihood of City employees as they were forced to go without pay for weeks due to Woods' game playing. The public was also shocked that Woods was using profanity and discriminatory language in the workplace. The Council later considered the issues related to Woods' misconduct in an executive session.

69.

Ms. Dosier then met with investigators from the Law Department for a second interview. The investigators suddenly shifted focus to Ms. Dosier's actions and questioned her on why she had not reported Woods sooner. When Ms. Dosier honestly explained that she was scared of retaliation from Woods as she had witnessed Woods' conduct first-hand, the investigators ignored Ms. Dosier.

70.

Despite Ms. Dosier's disclosure to the investigators notifying them of her fear of retaliation from Woods - and the possible loss of her (Ms. Dosier's) job - the investigators continued to focus on Ms. Dosier.

71.

For example, Ms. Dosier was questioned at length regarding her communications with members of the City Council, including the anonymous letter. Ms. Dosier did not know how to respond as the City Council members specifically directed her and Finley to keep the letter anonymous. Believing she needed to keep her involvement secret - as she had been directed to do by the City Council members, Ms. Dosier denied preparing the letter.

72.

Undeterred, the investigators then questioned Ms. Dosier about her contact with Thad Flowers from Councilman Brown's office and whether she had told Flowers that Starr had filed a police report. The continued focus on *her* actions - such as her communications with members of the City Council - shocked Ms. Dosier as they were acting as if she did something wrong when she was describing Woods' conduct as she had been directed to do by Boone and Bond.

73.

The investigators questioned Ms. Dosier about the removal of her administrator access to the Talent Acquisition system and an alleged audit of the offer letter process. Ms. Dosier had no knowledge of any audit, but she explained the changes she had made to the language of the electronic offer letter language at Finley's direction. At this point, it was obvious the City was looking for a reason to retaliate against Ms. Dosier instead of addressing the real issue: Woods.

74.

On June 20, 2019, Ms. Dosier learned that former colleagues of Woods from her prior employment were willing to speak to the City's investigators about Woods' pattern of abusive and threatening conduct. One individual contacted the Law Department directly after speaking to Ms. Dosier. For the other, Ms. Dosier emailed the contact information directly to Norman who said he would share it with the Law Department. Shockingly, there is no evidence the investigators ever contacted this possible witness.

75.

Five days later, the City issued a report on the investigation regarding Woods' altercation with Starr concluding that there was no evidence that Woods

had assaulted or attempted to assault Starr. Incredibly, no findings were made regarding Woods and her conduct which clearly violated the City's rules and regulations.

76.

On June 27, 2019, the Mayor's Office released the "Confidential" report (the "Report") to the media along with a self-serving statement announcing Woods' resignation and glowingly listing her accomplishments as Commissioner. Notably, Woods' use of the words "nigger" and "bitch" in the workplace were not included in the Report.

77.

In the Report, the City referenced other allegations related to Woods' conduct towards other employees and an ongoing second investigation into those allegations. The City never released a report on the second investigation.

78.

Despite her resignation, Woods requested and received authority to remain on the payroll for another four months until October 2019. Payroll records from the City show that Woods remained on the City's payroll until January 2020,

earning around $ 97,000 - paid by taxpayers - for sitting at home after her resignation.

79.

The Mayor's statement about Woods' resignation also indicated further changes coming to the HR Department. When Ms. Dosier contacted Finley to ask about her own job, Finley reassured her that her job was safe.

80.

On June 28, 2019, the day after the City announced Woods' resignation, Ms. Dosier again met with Councilmembers Boone and Bond. Since Woods had now resigned, Ms. Dosier openly walked into the City Council offices through the main door and signed in on the City Council's visitor log. At the meeting, they discussed the second investigation and Ms. Dosier's and other employees' fear of retaliation.

81.

On July 3, 2019, Ms. Dosier was terminated from her job with the City, for alleged violations of her rights as a system administrator that resulted in unapproved offers of employment being disseminated with no signature to "countless" new hires.

82.

Ms. Dosier confronted Finley for an explanation and Finley stated that she was shocked. Finley advised Ms. Dosier that she specifically told Norman that her (Ms. Dosier's) changes to the letter were directed by her (Finley) since Finley did not have access to the program as she was not involved.

83.

Finley confided to Ms. Dosier that the reasons provided in her termination letter were false and just a pretext for retaliation.

84.

The termination letter also stated that Ms. Dosier's access to the system was revoked as a result of this same "infraction" which was false.

85.

The City's entire investigation was a sham; Ms. Dosier freely admitted to making changes to the language of the letter at Finley's direction so the City's focus on screenshots tracking access to the system was a colossal waste of time.

86.

No audit was done of new hire records to confirm whether any employees actually received unauthorized offers as stated in the termination letter.

87.

It was only *after* Ms. Dosier engaged in protected speech that Norman and the City found the audit useful and then used it as pretext to retaliate against Ms. Dosier.

88.

The City of Atlanta adopted a "Bill of Rights" to guide the City Council, Mayor, and all departments of City government. Section 2 of the City's Bill of Rights states that "[t]he City of Atlanta shall not interfere with the rights of freedom of speech, of freedom of the press, to petition the government, or of peaceable assembly."

89.

Under the Atlanta Code of Ordinances ("City Code"), Sec. 114-84(b)(4), Ms. Dosier's position was an "unclassified" position with the City of Atlanta and was not protected under the civil service provisions of City Code with respect to discipline and termination.

90.

Under City Code Section 3-305(c), Ms. Dosier served at the pleasure of Norman as Interim Commissioner of Human Resources.

91.

Ms. Dosier was terminated from her employment at Normans's discretion as the Commissioner with official authority to hire and fire employees within the HR Department under the City Code.

92.

Ms. Dosier's reports to members of the City Council regarding Woods' illegal conduct constitutes a matter of public concern, because Ms. Dosier's complaints brought to light Woods' conduct.

93.

Ms. Dosier's disclosures to the City Council also brought to light the City's efforts to ignore Woods' misconduct.

94.

The public interest in information regarding the administration of the City's operations and misconduct by a City official outweighed the City's interest in regulating Ms. Dosier's speech.

95.

Norman terminated Ms. Dosier's employment because she engaged in protected speech on one or more matters of public concern.

96.

The decision to terminate Ms. Dosier violated her clearly established right to engage in free speech as a whistleblower and also as a citizen speaking on one or more matters of public concern.

97.

Ms. Dosier's internal report to Williams regarding Woods' misconduct was properly made pursuant to the City's Anti-Bullying and Workplace Violence Policy (HR.101.01), effective October 19, 2018, which was adopted in compliance with City Council Resolution 18-R-3779. Ms. Dosier reported the matter to Williams as Chief Operating Officer and Woods' direct supervisor.

98.

Norman was on notice of Ms. Dosier's protected activity because he participated in the City's investigation and had knowledge of Ms. Dosier's objections and disclosures regarding Woods' misconduct.

99.

Accordingly, Ms. Dosier engaged in protected activity under O.C.G.A. § 45-1-4(d)(2).

100.

Ms. Dosier was terminated from her position at the City of Atlanta in violation of O.C.G.A. § 45-1-4(d)(2) as a direct result of her disclosure of violations of law, rule, or regulation by Commissioner Woods.

101.

Defendants' wrongful termination of Ms. Dosier caused her great injury, including lost wages, the loss of accumulated fringe benefits of employment, loss of retirement income, diminished future earning capacity, tarnishment of her reputation, great uncertainty regarding her future, emotional distress, humiliation, and embarrassment.

## (ADDITIONAL FACTS IN SUPPORT OF COUNT III)

102.

On August 8, 2019, undersigned counsel, sent a notice to the City of potential legal action and directed the City to preserve evidence, including electronically-stored information.

103.

On February 19, 2020, Ms. Dosier, through her undersigned counsel, submitted a request for certain documents pursuant to the Georgia Open Records

Act ["ORA"], O.C.G.A. § 50-18-70, *et seq*. Ms. Dosier's request was submitted to

the designated Open Records email addresses for both the Office of the Mayor and

the Law Department.

104.

The request, in relevant part, sought the following documents:

> All documents related to any investigation into former Commissioner
> of H.R., Marian Woods, conducted since May 2019. This request
> seeks copies of the complete investigative file for each investigation,
> including without limitation, any complaint or report of wrongdoing,
> witness statements, notes or recordings of witness interviews, any
> documents considered or reviewed in the investigation, any report
> resulting from the investigation, any recommendations for resolution,
> and any communications relating to the complaint or investigation.

105.

Amber Robinson responded to the request on behalf of the Law Department,

stating: "The Department of Law believes that it is the custodian of documents

responsive to this request, and will conduct a diligent search to locate any

responsive documents.  We estimate that any search shall be concluded by no later

than March 2, 2020."

106.

On March 4, 2020, the Law Department produced a single document - the report dated June 25, 2019 on the first investigation into Woods' altercation with Starr. The same report was previously released to the media along with the announcement of Woods' resignation.  No other documents were produced and no exemptions were asserted in response to the Request.

107.

On May 28, 2020, undersigned counsel sent a letter to Ms. Robinson, which reiterated the request for all documents related to any investigation of Woods, including the second investigation into allegations made by HR employees and specifically referenced in the June 25, 2019 report.

108.

On June 3, 2020, Ms. Robinson responded that documents should be produced no later than June 19, 2020. The City, however, refused to produce documents and made no further response to this request until July 2, 2019.

109.

On July 2, 2019, Ms. Robinson sent the following response: "Following a diligent search for documents responsive to your request for a separate

investigation and any documents related thereto, the Department has determined that pursuant to OCGA Sec. 45-1-5, it is unable to produce responsive documents." The City provided no further explanation and cited no other exemptions at that time.

110.

O.C.G.A. § 45-1-5 provides that "[w]hen an employee of the state or of a county, municipality, or school district is terminated and, as a condition of a settlement agreement, the personnel file of the employee is to be partially or totally purged, the former employee's personnel records, including both the personnel file and any associated work history records, shall be clearly designated with a notation that such records have been purged as a condition of a settlement agreement."

111.

Ms. Dosier's request to the Law Department sought the records of an investigation and was not related to Woods' personnel file, which Ms. Dosier separately requested from the HR Department.

112.

The copy of Woods' personnel file produced by the records custodian from the HR Department contained no notation that any records had been purged from the file pursuant to a settlement agreement.

113.

On August 6, 2020, Ms. Dosier, through undersigned counsel, requested a copy of the settlement agreement between the City and Woods that formed the basis for the assertion of O.C.G.A. § 45-1-5.

114.

Ms. Robinson responded on behalf of the Law Department that "any documents responsive to this request in the custody of the Department of Law are exempt from production in accordance with the attorney/client privilege in accordance with OCGA Sec. 50-18-72(a)(41) or the attorney-work product doctrine in accordance with OCGA Sec. 50-18-72(a)(42)."

115.

Because a final settlement agreement between an employee and employer is not subject to attorney-client privilege or work product, Ms. Dosier sought clarification from the Law Department whether the City was asserting privilege as

to the final settlement agreement or whether the documents resided with the records custodian of another department within the City. The Law Department refused to provide any further clarification to support the exemptions or to address whether the settlement agreement even exists.

116.

Ms. Dosier sought to resolve this dispute through the City's Chief Transparency Officer, Kathleen Denius, requesting clarification of the Law Department's assertion of O.C.G.A. § 45-1-5 as a basis to withhold the records of the second investigation and assertion of attorney-client privilege and/or work product as to the settlement agreement with Woods. Ms. Denius declined to intervene and deferred to the Law Department on both matters.[1]

117.

All of the documents Ms. Dosier requested are "public documents" within the meaning of O.C.G.A. § 50-18-70(a).

---

[1] Undersigned counsel also requested assistance from Ms. Denius on other outstanding items, including investigative documents related to the report issued on June 25, 2019 and a request for emails from the Mayor's Office. Although the records have not been provided, the City has indicated its intent to turn over the records. Should the City refuse to provide these records, Ms. Dosier will amend her Complaint to include same.

118.

There was no substantial justification for withholding the documents Ms. Dosier requested, nor do any special circumstances exist which would justify the actions of the City in refusing to produce the records.

119.

Upon information and belief, the City intentionally refused to produce the documents Ms. Dosier requested in bad faith to continue to conceal and cover-up Woods' misconduct, and to frustrate Ms. Dosier's attempt to gather facts related to her present lawsuit.

**COUNT I**
**Retaliation in Violation of 42 U.S.C. § 1983**
**and the First Amendment Right to Free Speech**
***(against all Defendants)***

120.

All preceding paragraphs are incorporated as if fully set forth herein.

121.

The First Amendment to the United States Constitution, made applicable to the states and local governments by the Fourteenth Amendment, protects the right of government employees to speak as citizens on matters of public concern.

122.

Ms. Dosier's reports to the City Council regarding Woods' illegal misconduct, violations of City regulations, and the City's attempts to conceal Woods' actions constituted protected speech that addressed a matter of significant public concern – namely the continued disregard of senior City officials for compliance with City rules and the manipulation of the City's investigative process to hide wrongdoing by a senior official.

123.

Ms. Dosier's report to the City Council members was beyond the scope of her employment because her role as a recruiter at the City was in no way related to handling illegal conduct or workplace complaints. In fact, Ms. Dosier's main duties often kept her outside of the workplace, and she was not focused on the actions within City Hall.

124.

Dosier far exceeded reporting the matter internally. When it was obvious that the Law Department and the Mayor's office planned to conceal Woods' misconduct with a sham investigation, Ms. Dosier made the matter public by disclosing it to the City Council.

125.

Ms. Dosier's reports to the City Council did not threaten the City of Atlanta's ability to administer public services.

126.

Ms. Dosier's right to report Woods' misconduct to the City Council and to object to the City's cover-up outweighed any legitimate interest that Defendants may have had in promoting the efficiency of public services for the City.  To the contrary, Woods' actions were a deterrent to efficiency based on her refusal to use the tools implemented by the City and refusal to follow the policies she was responsible for enforcing.

127.

The termination of Ms. Dosier's employment was a direct result of her protected speech and violated her clearly established right to free speech under the First Amendment and 42 U.S.C. § 1983.

128.

Ms. Dosier, at all times, performed her duties as Talent Acquisition Manager in a satisfactory manner.

129.

Defendants would not have terminated Ms. Dosier in the absence of her protected speech.

130.

Norman terminated Ms. Dosier pursuant to the City's policies and practices providing him with discretion over employment decisions in HR. Norman's decision to terminate Ms. Dosier was final and not subject to appeal or reversal by any other official or entity.

131.

The City is liable for the decision to terminate Ms. Dosier because Norman had full discretionary authority over Ms. Dosier's continued employment; neither

Norman nor the City had a valid interest in regulating Ms. Dosiers's protected speech to the City Council regarding Woods' wrongdoing.

132.

Defendant City of Atlanta, by its policies and practices, retaliated against Ms. Dosier based on her protected speech and deprived her of her right to freely speak on matters of significant public concern. Defendant City of Atlanta had no legitimate government interest in terminating Plaintiff's employment.

133.

Defendants acted under color of state law to retaliate against Ms. Dosier for exercising her First Amendment right to freedom of speech, in violation of 42 U.S.C. § 1983.

134.

At all times relevant hereto, the law was clearly established that it was unlawful to retaliate against a public employee for exercising their free speech rights secured under the First Amendment to the United States Constitution.

135.

As a result of Defendants' unlawful actions, Ms. Dosier has suffered lost compensation and other benefits of employment, emotional distress,

inconvenience, loss of income, humiliation, damage to her reputation, and other indignities, in an amount to be proven at trial.

136.

Ms. Dosier is entitled to her reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

**COUNT II**
**RETALIATION UNDER THE**
**GEORGIA WHISTLEBLOWER ACT, O.C.G.A § 45-1-4, et seq.**
*(against the City of Atlanta only)*

137.

The foregoing paragraphs are incorporated as if fully set forth herein.

138.

Pursuant to O.C.G.A. § 45-1-4(d)(2), it is unlawful for a public employer to retaliate against a public employee for disclosing to a supervisor or government agency conduct that the public employee has reasonable cause to believe is in violation of or noncompliance with a law, rule, or regulation.

139.

Prior to her termination in July 3, 2019, Ms. Dosier engaged in protected activity under the Whistleblower Act by disclosing conduct that she reasonably believed was in violation of or noncompliance with a law, rule, or regulation.

140.

Defendants' termination of Ms. Dosier was in retaliation for her protected disclosure of conduct that she reasonably believed was a violation of a law, rule, or regulation under O.C.G.A. § 45-1-4.

141.

The termination of Ms. Dosier's employment amounted to an adverse action under O.C.G.A. § 45-1-4.

142.

Defendants' adverse action caused great damage to Ms. Dosier.

143.

The Defendants are liable for all economic and non-economic damages resulting from this retaliation, pursuant to O.C.G.A. § 45-1-4(e)(2)(D) and (E).

144.

Because reinstatement to her prior position with the City as is not practicable, Ms. Dosier is entitled to front pay in lieu of reinstatement.

145.

Ms. Dosier is entitled to recover damages for lost wages, the loss of accumulated fringe benefits of employment, loss of retirement income, diminished future earning capacity, tarnishment of her reputation, great uncertainty regarding her future, emotional distress, humiliation, and embarrassment, pursuant to O.C.G.A. § 45-1-4(e)(2)(D) and (E).

146.

Ms. Dosier is entitled to recovery of her attorneys' fees and all other costs of litigation, pursuant to O.C.G.A. § 45-1-4(f).

147.

Ms. Dosier's claim is timely under O.C.G.A. § 45-1-4, pursuant to the Fourth Order Extending Declaration of Statewide Judicial Emergency[2], issued by the Georgia Supreme Court on July 10, 2020, which reimposed all statutes of

---

[2] A copy of the Supreme Court Order is available at:
https://www.gasupreme.us/wp-content/uploads/2020/07/4th-SJEO-FINAL.pdf.

limitation under Georgia law effective July 14, 2020, subject to the following relevant extension language in Section II(A)(10): "The 122 days between March 14 and July 14, 2020, or any portion of that period in which a statute of limitation would have run, shall be excluded from the calculation of that statute of limitation."

## COUNT III
## VIOLATIONS OF THE OPEN RECORDS ACT, O.C.G.A. § 50-18-73
### *(against the City of Atlanta only)*

148.

The foregoing paragraphs are incorporated as if fully set forth herein.

149.

The City has refused to produce documents responsive to Ms. Dosier's lawful ORA request in bad faith and without substantial justification for the non-compliance with the ORA, O.C.G.A. § 50-18-70, *et seq.* No special circumstances exist to justify the City's refusal to produce documents.

150.

Neither O.C.G.A. § 45-1-5, nor any other exemption or exception to the ORA applies to the documents Ms. Dosier requested.

151.

The City's actions are in violation of the ORA, O.C.G.A. § 50-18-70, *et seq.*, and give rise to this action pursuant to O.C.G.A. § 50-18-73.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands a **TRIAL BY JURY** and requests the following relief:

(a)     That Plaintiff be awarded a declaratory judgment that Defendants are in violation of 42 U.S.C. § 1983 and the First and Fourteenth Amendment to the United States Constitution;

(b)     That Plaintiff be granted judgment against Defendants, as requested, under Counts I – III;

(c)     That this Court issue a permanent injunction against Defendants, prohibiting the City and the individual Defendants from engaging in any employment practice or policy which retaliates against others similarly situated to Plaintiff because of their protected speech or opposition to unlawful practices, or because of their participation in this lawsuit;

(d)     That Plaintiff be awarded front pay as an alternative to reinstatement;

(e)    That Plaintiff recovers from Defendants back pay, benefits, and any other equitable relief that is owed, with prejudgment interest thereon;

(f)    That Plaintiff has and recovers compensatory damages in an amount to be determined by a jury;

(g)    That the Court issue a Writ or injunctive order compelling Defendant City to produce all records responsive to Plaintiffs ORA Request instanter;

(h)    That the Court award Plaintiff reasonable attorneys' fees and costs incurred in bringing her Open Records Act action, as permitted by O.C.G.A. § 50-18-73(b);

(i)    That Plaintiff has and recovers her costs in this action and  reasonable attorneys' fees as provided by law; and

(j)    Any and other such further relief that this Court or the Finder of Fact deems equitable and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues triable by jury.

Respectfully submitted this 2nd day of November, 2020.


**WORTH JARRELL LLC**

*/s/ Katy Aultman*
Kimberly A. Worth
Georgia State Bar No. 500790
kworth@thrasherworth.com
Katy Aultman
Georgia State Bar No. 359702
kaultman@worthjarrell.com

*Attorneys for Plaintiff*

Five Concourse Parkway
Suite 3200
Atlanta, Georgia 30328
Telephone/Fax: (404) 760-6016

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel certifies that the foregoing has been prepared in Times New Roman (14 point) font, as required by the Court in Local Rule 5.l (C).

Respectfully submitted this 2nd day of November, 2020.

**WORTH JARRELL LLC**

*/s/ Katy Aultman*
Kimberly A. Worth
Georgia State Bar No. 500790
kworth@thrasherworth.com
Katy Aultman
Georgia State Bar No. 359702
kaultman@worthjarrell.com

*Attorneys for Plaintiff*

Five Concourse Parkway
Suite 3200
Atlanta, Georgia 30328
Telephone/Fax: (404) 760-6016